**Charles H. SMITH, Plaintiff–Appellant,**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, Defendant–Appellee.**

No. 663, Docket 87–7741.

United States Court of Appeals, Second Circuit.

Argued Feb. 9, 1988.

Decided Aug. 31, 1988.

L. Kevin Sheridan, Mineola, N.Y. (Jesse C. Sable, Mineola, N.Y., Santemma & Murphy, P.C., Mineola, N.Y., Moss, Moss & Cirillo, New Haven, Conn., of counsel), for plaintiff-appellant.

H. Bissell Carey, III, Hartford, Conn. (Eric Lukingbeal, Ronald W. Zdrojeski, Robinson & Cole, Hartford, Conn., of counsel), for defendant-appellee.

Before CARDAMONE and PIERCE, Circuit Judges, and STANTON, District Judge.*

PIERCE, Circuit Judge:

Appellant Charles Smith was employed by the National Railroad Passenger Corp. ("Amtrak") as Superintendent of its Rail Weld and Cropping Plant in New Haven, Connecticut, until he was shot and seriously wounded by a disgruntled fellow employee on March 20, 1981. On the morning of that day, Smith reprimanded the employee, Joseph Leonetti, for having been in a restaurant eating breakfast when he was supposed to be at work. A few hours later, Leonetti entered Smith's office and fired

* Hon. Louis L. Stanton, *Judge,* United States District Court for the Southern District of New York, sitting by designation.

two shotgun blasts at him, striking him once in the leg, shattering the kneecap and adjacent bone. In February 1983, following repeated periods of hospitalization, Smith sued Amtrak in the United States District Court for the District of Connecticut under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51–60 (1982), and in February 1987, after a 13-day jury trial, was awarded damages in the amount of $3.5 million.

The district court, Ellen Bree Burns, *Judge,* thereafter granted Amtrak's motion for entry of judgment notwithstanding the verdict and for a new trial. In granting judgment n.o.v., the court ruled that there was insufficient evidence for the jury to find that Smith's injuries were causally related to Amtrak's negligence in not reporting or disciplining plaintiff's assailant when he previously demonstrated his propensity for violent behavior. Because Smith was the individual responsible for imposing disciplinary sanctions against Amtrak employees at the New Haven plant, the court reasoned, "any disciplinary action relative to the earlier incidents would have also precipitated an attack upon plaintiff. In this sense, since the record demonstrates that the reporting of a violation of the rules actually led to plaintiff being shot, it cannot be said that the failure to report prior incidents played any role in the causing of injury to plaintiff."

In addition to directing the entry of judgment n.o.v., the court also granted Amtrak's motion for a conditional new trial. Judge Burns ruled that Amtrak was prejudiced by allusions in plaintiff's counsel's summation to plaintiff's fears of never having a family, becoming a public charge, and experiencing pain and suffering in the future if his infection recurred. This appeal ensued and we now reverse.

## DISCUSSION

█ In a case arising under the FELA, a court may set aside a jury verdict and enter judgment n.o.v. "[o]nly when there is a complete absence of probative facts to support the conclusion reached" by the jury. *Lavender v. Kurn,* 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946). The district court determined that there was ample evidence to support the verdict that Amtrak was negligent in not following its own rules requiring that employee misconduct be reported to supervisory personnel. However, it concluded that the jury must have engaged in impermissible speculation regarding the causative link between that negligence and plaintiff's injury, since the evidence adduced at trial showed that Leonetti's propensity for violence would likely have caused him to attack Smith whenever it was reported that Leonetti had committed an infraction of an Amtrak rule sufficiently serious to require that Smith impose a disciplinary sanction. Consequently, it reasoned, Amtrak's negligence did not cause plaintiff's injury since Smith would have been injured even if the earlier incidents had been reported.

The standard of causation in an FELA action is a "low and liberal" one that "works in favor of submission of issues to the jury ... rather than toward foreclosure through a directed verdict or judgment n.o.v." *Diebold v. Moore McCormack Bulk Transp. Lines, Inc.,* 805 F.2d 55, 58 (2d Cir.1986). The jury was properly instructed that it should find the defendant liable if Amtrak's "negligence played any part, even the slightest," in contributing to Smith's injury, *Rogers v. Missouri Pac. R.R.,* 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493, *reh'g denied,* 353 U.S. 943, 77 S.Ct. 808, 1 L.Ed.2d 764 (1957), and after seeking clarification of the court's instructions on causation, it awarded plaintiff $3.5 million in compensatory damages. While the causal connection between Amtrak's negligent conduct and Smith's injury was undoubtedly weak, "Congress vested the power of decision in these actions exclusively in the jury in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played *any* part in the employee's injury." *Id.* at 510, 77 S.Ct. at 450 (footnote omitted) (emphasis added).

Although the district court thought the jury engaged in impermissible speculation by determining that Smith might have been

able to avoid injury if forewarned of Leonetti's violent tendencies, it was just as speculative for the court to infer that Leonetti would have attacked Smith whenever and however a reprimand were given. In cases involving a negligent failure to act, "courts have been generous in permitting the evidence to go to the jury ... even 'though it is often a pretty speculative matter whether the precaution would in fact have saved the victim.'" *Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 11 (1st Cir.) (quoting 2 F. Harper & F. James, *The Law of Torts* § 20.2, at 1113 (1956)), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982). Where two equally permissible inferences may be drawn from a single set of facts, we cannot conclude that no fair-minded juror could reasonably infer that Amtrak's negligence played some part in causing plaintiff's injury.

> The negligence of the defendant cannot be excluded as one of the actual causes of the accident, unless it can be said *with certainty* that, even if the defendant had not been negligent, the accident would nevertheless have happened. It is not enough to speculate "that the same harm might possibly have been sustained had the actor not been negligent." Restatement of Torts, § 432, Comment "c".

*Billiar v. Minnesota Mining & Mfg. Co.*, 623 F.2d 240, 247 (2d Cir.1980) (quoting *Rugg v. State*, 284 A.D. 179, 182, 131 N.Y. S.2d 2, 6 (App.Div.1954); emphasis in *Billiar*). Given the low burden of proof on the element of causation in a FELA action, we conclude that the jury verdict was supported by the evidence adduced at trial and should not have been set aside by the district court. *See generally* 4 F. Harper, F. James & O. Gray, *The Law of Torts* § 20.2, at 97–98 (2d ed. 1986).

■ Based upon what it perceived as the improper remarks of plaintiff's counsel during his summation to the jury, the district court also granted Amtrak's motion for a conditional new trial. Although an order granting a new trial is generally not appealable, *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34, 101 S.Ct. 188, 189, 66 L.Ed.2d 193 (1980) (per curiam), an appellate court may review such an order when,

as here, it is issued in conjunction with the grant or denial of judgment n.o.v. and the new trial is conditional upon appellate reversal of that judgment. Fed.R.Civ.P. 50(c); *Akermanis v. SeaLand Service, Inc.*, 688 F.2d 898, 904 (2d Cir.1982), *cert. denied*, 461 U.S. 927, 103 S.Ct 2087, 77 L.Ed.2d 298 (1983); 9 J. Moore, B. Ward & J. Lucas, *Moore's Federal Practice* ¶ 110.08[3], at 122 (2d ed.1987).

■ Although trial courts possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial, *see Draper v. Airco, Inc.*, 580 F.2d 91, 94 (3d Cir.1978), attorneys also require latitude in formulating their arguments, *see Schwartz v. Northwest Airlines, Inc.*, 275 F.2d 846 (2d Cir.1960) (per curiam). Not every improper or poorly supported remark made in summation irreparably taints the proceedings; only if "counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury," *Strobl v. New York Mercantile Exchange*, 582 F.Supp. 770, 780 (S.D.N.Y.1984), should a new trial be granted. In this case, we do not think that the conduct of plaintiff's counsel was so improper or prejudicial as to warrant a new trial.

The evidence adduced at trial showed that Smith's injuries from the shooting caused him to suffer from a painful bone infection called osteomyelitis. Although Smith conceded that he was not suffering from the infection at the time of trial, his leg had been infected from the time of the shooting in 1981 until late 1983. He was hospitalized for more than two months following the shooting, and readmitted for another two months during the fall of 1981. His infection reappeared for a short time in 1984, following surgery to remove a supportive steel plate from Smith's leg. According to the testimony of plaintiff's doctors, the disease might reappear at any time because gunshot fragments remained permanently lodged in Smith's leg. Smith's previous treatment for this disease required the physicians to open the wound to the bone, to leave it open in order to allow the infection to drain, and to change the dressings on the wound frequently,

thereby causing Smith "excruciating" pain when the dressing was removed and replaced.

■ During his summation to the jury, plaintiff's counsel made the following remarks about plaintiff's experience with osteomyelitis:

The osteomyelitis, this is a fear that he lives with. And you remember, if you will, there was another doctor.... And if you recall, I read to you what he stated about the devastation that had been wrecked [sic] upon this man, not only upon his knee but upon him. And he gave us his opinion as to the osteomyelitis, that this is a disease that can reappear at any time and if it reappears, they have to treat it as they treat it [sic] in the past. And you remember the terrible and horrible pain that the osteomyelitis, that infection, caused him. So you have to in fair consideration and for reasonable compensation consider osteomyelitis.

The district court interpreted this statement as an improper argument that Smith should be compensated for future pain and suffering, whereas the medical evidence only established that the disease might but would not necessarily recur. However, as the district court charged the jury, Smith was "entitled to a sum that will reasonably compensate him for any pain, discomfort, *mental anguish,* loss of functions and inability to carry out life's normal activities that you find he is reasonably certain to suffer in the future from the same cause" (emphasis added). The mere fact that there was uncertainty as to the likelihood of recurrence of Smith's osteomyelitis does not mean that he was not entitled to compensation for the mental anguish associated with living in trepidation of again suffering from the infection. Consequently, counsel's argument, phrased as it was in the context both of plaintiff's past and present suffering, and of his well-grounded fear of potential future suffering, was neither "wholly unsupported by evidence," as the district court found, nor so prejudicial as to require a new trial.

The district court's new trial order also relied on two other statements made by counsel when arguing that Smith was entitled to compensation for loss of "enjoyment of living":

And, you know, talking about enjoyment of living, what we're saying is that working, no matter how many hours you work, is not what it's all about. What it's all about really and what we all want is the right to come home to family, to have a family, to have perhaps children, to be able to enjoy all of the good things that life offers. And if part of the good things is going out and bowling with your friends, and if that's what you like to do, that's enjoyment of living—or whether it's flying a plane or whatever. That's what you work for, so that you can do those things, so that you can have a home.

And you and each of you [sic] now have it in your power to give back some of that to Charlie Smith, to restore to him some of the things that he has lost. You have the power to give back the dignity that was taken from him, give him now a sense of security, to remove that fear of becoming a public charge or the fear of having always to be dependent or a financial burden to others, to be able to care for himself and maybe somebody else as well, maybe to buy a home and equip it as he has to in order to meet his own personal needs. And this is really what you're being asked to do.

This argument was based on evidence which showed the great disruption to plaintiff's lifestyle as a result of the shooting. There was evidence that the injury to his leg was disabling and required him to wear a metal brace and a special shoe in order to walk, and that he had suffered a heart attack and a partially paralyzing stroke, both of which incidents plaintiff's expert witnesses testified were causally related to the trauma and strains resulting from the shooting. Smith himself testified that he had been unable to work since his injury; that he was no longer able to go bowling, as he had regularly done before the shooting; that although he was a licensed pilot, he would no longer be able to fly an airplane; that he had lost all sensation on his

right side, as well as functional use of his right arm; and that financial duress had forced him to sell his house and to move into his mother's home. However, the court found counsel's argument to be unsupported and prejudicial because there was no evidence that plaintiff, a bachelor, would be unable to marry or have children; that he was unable to care for himself; or that he was financially destitute and in need of public welfare. Consequently, it decided that Amtrak was entitled to a new trial. We disagree.

While the statements about plaintiff's ability "to come home to family" and "to be able to care for himself and maybe somebody else as well," and his "fear of becoming a public charge" perhaps were not particularly precise or well-phrased in light of the trial evidence, when read in context, they do not require a new trial. What counsel was arguing essentially was that Smith had been deprived of what might be called a "normal life": he was no longer able to experience life's satisfactions in the manner that had previously been available to him. Furthermore, the evidence showed that because of his injuries, Smith must rely for the rest of his life on the assistance of others and on specially designed equipment in order to perform some of the tasks that, prior to March 1981, he had performed unaided as a matter of course.

The statements in question appear in just two paragraphs of a summation that exceeds 55 pages of transcript. We do not believe that the argument was so inflammatory and unsubstantiated that it could have significantly prejudiced the jury. Indeed, the jury sought clarifying instructions from the court on the elements that plaintiff needed to prove to establish Amtrak's liability, and it deliberated for a total of six hours over two days, with a weekend in between, before reaching its verdict. These circumstances indicate to us that the jury did not rush to render a verdict for the plaintiff merely because its passions were ignited by counsel's argument; rather, it shows that the jury sought to weigh the evidence carefully and to apply the law on

which it had been instructed. We conclude that the district court should not have granted Amtrak a new trial on the ground that plaintiff's counsel's summation prejudiced Amtrak.

Amtrak also argues that it is entitled to a new trial because (1) plaintiff failed to establish a causal connection between its negligence and plaintiff's injuries, (2) it was not foreseeable that Leonetti would assault plaintiff, and (3) the jury's verdict was excessive. The first two grounds, as already discussed with respect to the granting of judgment n.o.v., lack merit. Regarding the jury's $3.5 million verdict, we are mindful that "[w]hen reviewing a claim of excessive damages, an appellate court must accord substantial deference to the jury's determination of factual issues." *Wheatley v. Ford*, 679 F.2d 1037, 1039 (2d Cir.1982) (citation omitted). In light of Smith's youth and severe injuries, we cannot say that the damages "are so excessive 'as to shock the judicial conscience.'" *Id.* (quoting *United States ex rel. Larkins v. Oswald*, 510 F.2d 583, 589 (2d Cir.1975)).

One further issue is presented. Plaintiff requests, in accordance with Fed. R.App.P. 37, that this Court direct that post-judgment interest be awarded from the date of the jury verdict rather than from the date of the mandate that will issue from this Court. We note at the outset that the circuit courts of appeals are divided on the question of the propriety of awarding interest from the date of a reinstated jury award. *See Chattem, Inc. v. Bailey*, — U.S. —, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988) (White, J., dissenting from denial of writ of certiorari). In this circuit, we have previously interpreted 28 U.S.C. § 1961 to require that interest is to run only from the date of our own mandate. *Powers v. New York Cent. R.R.*, 251 F.2d 813, 818 (2d Cir.1958). However, we do not believe that *Powers* any longer controls our resolution of this question.

In 1968, ten years after our decision in *Powers*, the Federal Rules of Appellate Procedure became effective, and Fed.R. App.P. 37 was adopted specifically to ad-

dress the question whether, under 28 U.S.C. § 1961, "when the court of appeals reverses a judgment notwithstanding the verdict and directs entry of judgment on the verdict... interest is to run from the date of entry of the judgment directed by the court of appeals or from the date on which the judgment would have been entered in the district court except for the erroneous ruling corrected on appeal." Fed.R.App.P. 37 advisory committee note. The rule states that, "If a judgment is modified or reversed with a direction that a judgment for money be entered in the district court, the mandate shall contain instructions with respect to allowance of interest." *See also* 16 C. Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice & Procedure* § 3983 (1977). This provision gives appellate courts discretion to decide the issue on a case-by-case basis.

Since the Rules Enabling Act, 28 U.S.C. § 2072 (1982), pursuant to which the appellate rules were promulgated, directs that, "All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect," and since there have been no intervening decisions of this Court reaffirming the *Powers* rule, we conclude that *Powers'* interpretation of § 1961 has been superseded by Rule 37. *See also Jones & Laughlin Steel, Inc. v. Mon River Towing, Inc.,* 772 F.2d 62, 66 (3d Cir.1985) (Fed.R.Civ.P. 4 supersedes service of process requirements of the Suits in Admiralty Act, 46 U.S.C. § 742); *cf. Bank of Nova Scotia v. United States,* — U.S. —, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (Fed.R. Crim.P. are as binding as statute). Consequently, this Court has the discretion under Rule 37 to decide in a particular case whether interest should run from the date of the original jury verdict. In this case, we believe that the equities weigh in favor of the appellant: not only is post-judgment interest designed "to compensate the 'wronged plaintiff' for the loss of the use of a money judgment," *Affiliated Capital Corp. v. City of Houston,* 793 F.2d 706, 710 (5th Cir.1986) (in banc), but the FELA statute itself "seeks fully to compensate injured railroad employees," *Poleto v. Con-*

*solidated Rail Corp.,* 826 F.2d 1270, 1277 (3d Cir.1987).

Accordingly, we think it appropriate to compensate Smith for the loss of use of his compensatory damage award and therefore grant his request for post-judgment interest.

## CONCLUSION

The judgment notwithstanding the verdict is reversed, as is the order granting Amtrak a conditional new trial, and the case is remanded with instructions to enter judgment on the jury verdict. The mandate shall direct the district court to award appellant post-judgment interest from February 18, 1987, the date that judgment on the jury verdict was originally entered.